STUBBS & TISON v. FLEMING et al.

1. A direct interrogatory, added without notice to the other party, after the interrogatories were crossed, should be disregarded; and excluding the answer to the same was not error.
2. Notes are not evidence of the maker's insolvency or indebtedness at any time previous to their dates, it not appearing when the consideration of them was received.
3. If the owner of a stock of merchandise, with a view to defeat his existing creditors and to secure for the enjoyment of his wife, or of her and himself, the said stock, and the benefits of a continuous business to be conducted by the use thereof, enter into a combination with the wife and a third person, under which there are to be a sham or simulated sale to such third person, a note and mortgage executed by him to the husband and a transfer to the

wife, the business to go on in the name of the third person, who is to receive either a salary or an interest, etc., etc., debts created by such third person in conducting the business may, by reason of the fraudulent combination, be chargeable to any two or all three as partners, or, if not as partners, as joint wrong-doers, if the fraudulent scheme either originally, or subsequently, embraced a purpose to benefit the conspirators, whether jointly or severally, by defrauding persons who might become creditors of the ostensible owner of the business, that is, the third person in whose name it is carried on. If the wife alone had the real ownership of the business, and the ostensible owner was merely an agent, the legal doctrine of concealed principal would apply, so as to entitle the creditor to a judgment against the real owner as such. The plaintiffs' pleading being based on the uniform procedure act of 1887, all aspects, legal and equitable, which the facts present, are involved.

4. On the evidence in the record, the court erred in granting a nonsuit.                                        *Judgment reversed.*

March 27, 1893. Argued at the last term.

Equitable petition.   Before Judge GUERRY. Clay superior court.   March term, 1892.

The petition against Fleming, and against Simpson and wife, was brought by Stubbs & Tison, creditors of Fleming by note and open account. It was alleged that the Simpsons were liable for the payment of the plaintiffs' claim, because they held Fleming out as the owner of the stock of goods with which he did business during the time the credit to him was extended; that the stock belonged to Simpson who, being deeply insolvent, transferred it in 1888 to his wife, and she transferred it to Fleming, who was poor and impecunious, who had been clerking for Simpson, and who continued to run the business in reality for Mrs. Simpson though in his own name; and that when he began to be pressed by creditors he made to her a mortgage on the stock, the same was at once foreclosed, and the stock was turned over to her and sold; all of which was in pursuance of a scheme of the defendants to hinder and defraud the creditors of Simpson, and the creditors of Fleming who

extended credit on the faith of the stock of goods worth five or six thousand dollars. At the close of the evidence introduced by the plaintiffs, the court granted a nonsuit as to the Simpsons, and the plaintiffs excepted. They assigned error also upon the refusal to admit certain evidence hereafter mentioned.

The testimony of Fleming was as follows: I and Grist were employed by Simpson. Prior to October 1, 1888, I was paid for my services between $25 and $50 per month, and board. When I first resided in Fort Gaines I was worth very little; about October 1, 1888, I was worth about $1,000 that I had inherited from my father's estate. Had but little money, and don't know where I kept it. Gave Simpson a note and mortgage, date of which I do not remember; think it became due ten years after date; it was on a stock of goods then in Simpson's store-house, and what goods might be in the house when the debt became due. This note and mortgage were last in my possession in August or September, 1891; saw them last in September, 1891; gave them to C. Wilson. The consideration of said note and mortgage was the stock and fixtures of the store. There was no secret trust. The mortgage covered the goods in the store owned either by Simpson or his wife; they were invoiced at about $10,000. No goods were put into the stock by Simpson after the mortgage was executed, but a short time before about $5,000 was put in. Grist and Simpson suggested to me the buying of the goods. Grist drew the mortgage. My recollection is, I executed a paper to Simpson or his wife at the time of giving said note and mortgage; the purport of this paper was, that should Simpson or his wife get dissatisfied, or should I fail to pay the interest monthly, they were to take the goods back upon the same terms and price as I got them. This paper was signed by Mrs. Simpson and me, and referred to the mortgage as re-

cited.   Do not know where it is; have not seen it since
it was executed; it was delivered to Simpson or his wife
for the security of his wife.   Another paper was given
at the same time, signed by Simpson, allowing me and
Grist $50 each per month for our services.   I agreed to
allow Grist $50 per month, and that I myself would not
use more than that.   Was not present when the above
described mortgage was transferred from Simpson to his
wife; do not know whether it was transferred for a vol-
untary consideration or not.   I was clerking for Simp-
son when I bought the goods.   Grist was clerk and
book-keeper for Simpson.   Grist made the trade for me.
The business was run in my name for about two years;
it ceased to be run in my name on or about November
1, 1891.   Grist was clerk and book-keeper during this
time.   On November 18, 1890, I executed a note and
mortgage to Mrs. Simpson, due one day after date.   I
then owed her the former mortgage; the latter was
given in lieu of the former.   Had no transaction with
her personally, in reference to the purchase of the stock;
all the transaction was with Simpson.   The trade was
transacted at his instance.   The presence of Savannah
creditors, and the fact that the old mortgage was never
recorded, caused me to make the new mortgage.   Do
not know how many dollars worth of goods were
bought or sold during the time the business was con-
ducted in my name.   The value of the goods when the
mortgage to Mrs. Simpson was executed was between
$5,000 and $7,000.   Do not remember how much I owed
exclusive of mortgage debt.   Was insolvent when mort-
gage was made.   To the best of my knowledge and
belief Simpson was insolvent.   Do not remember value of
notes and accounts due me, nor the value of those turned
over to Mrs. Simpson or to Simpson.   All the books
belonging to the business were turned over to Simpson
and wife, except two which I turned over to the sheriff.

Don't know where the books were. Do not know how much I paid Simpson between October 1, 1888, and November 18, 1890; Grist attended to that business; I left all of that business with Grist. When Simpson made the trade with me, he owed large sums of money, and was pressed by his creditors. To the best of my knowledge and belief, the trade was made to keep off his creditors. That business was mine, not Simpson's, when carried on in my name. I was not his clerk, nor did I receive a salary from him. Grist was employed by me as book-keeper at instance of Simpson, and received his salary from me. There was no salary to be paid to him or to me by Simpson. To a certain extent Simpson did continue to direct and superintend the business. It was agreed and understood that he was to have the right to do so. I turned over the goods to the sheriff, who turned them over to Simpson or his wife. To the best of my knowledge and belief they were sold for her benefit; don't know who got the benefit of them. In 1890, while business was carried on in my name, I borrowed large sums (amounts not remembered) from plaintiffs, to be used in carrying on the business; and the money was so used. Do not know whether any of it was advanced to farmers or not, as Grist had management of the business. Some of it went to purchasing goods and to paying off the debts of the business. Don't know whether any of it was used in paying salaries or not. It was borrowed for benefit of the business. Simpson did not request it of me, but he did suggest it to Grist, who really was the person who borrowed the money; he borrowed it in my name, for benefit of business, at the instance of Simpson. I did not tell them anything about whose business it was, and do not know whether Grist did or not. I did not disclose who was the real owner of the goods. Grist managed the entire business.

The note of Fleming to plaintiffs was dated February

24, 1890, for $2,118.67, due November 15, 1890. His account with them, as it appears in the record, commences with a balance due of February 11, and runs to November 20, 1890. The note and mortgage from Fleming to Simpson was dated October 1, 1888, due January 1, 1894, for $10,000, with interest at 8 per cent., covered the stock of goods, and was due and payable at any time Fleming should fail to pay the interest on the note. His note and mortgage to Mrs. Simpson was dated and due November 18, 1890, for $10,000, and ten per cent. attorney's fees. It was foreclosed on the next day, and execution issued. The plaintiffs introduced also five notes from Simpson to McLain & Co., for $2,000 each, dated April 9, 1887, due in the next October, November and December, secured by a mortgage on land. The mortgage was foreclosed in December, 1890. Another note for $1,000 from Simpson to the same firm, dated July 7, 1887, and due October 1, 1888, was introduced. It appeared that Schmertz & Co. held a judgment against Simpson for over $600. The tax digests were in evidence. For 1888 it appeared that Fleming returned no property, Mrs. Simpson returned none, and Simpson returned property to the amount of $17,400. For 1889 Fleming returned $5,000 in merchadise; Mrs. Simpson returned $10,000 in money, notes, accounts, etc., and Simpson returned property the amount of which the evidence does not state. For 1890 Fleming returned $4,050 in merchandise chiefly, Mrs. Simpson returned $10,750 in money, notes and accounts, and Simpson returned $4,500 in property. A note of Blanchard, Humber & Co. against Fleming was introduced, and M. Blanchard testified that the same was a good subsisting debt. The sheriff testified that the books of Fleming turned over to him were given by him to Simpson. From responses made to notices served, it appeared that all the books, invoices and agreements between Flem-

ing and Simpson or Mrs. Simpson were last in the power, custody and control of Simpson, and that they had been lost or destroyed.

The plaintiffs offered in evidence 82 notes of $100 each, made by Simpson to Lloyd Cecil, dated February 26, 1889, and due one day after date, together with the justice's court summonses attached to them, showing judgments rendered thereon March 18, 1889. These were rejected as irrelevant.

The testimony of Fleming was by interrogatories. In answer to a cross-interrogatory he stated that he had a settlement with plaintiffs since making this debt. One of the plaintiffs' attorneys testified that this was not a settlement of the papers here sued on, but that it referred to a trover suit between plaintiffs and Fleming. The plaintiffs offered an interrogatory propounded to Fleming, and the answer thereto, marked "rebuttal," as explanatory of the answer of the witness to the cross-interrogatory; but the interrogatory so offered was ruled out because it had been attached after the interrogatories had been crossed, and because defendants' counsel had had no notice of it. The testimony thus sought to be introduced was, that the settlement with plaintiffs was confined to the return by Fleming of certain collateral notes and mortgages he held for them, and the dismissal of the bail-trover suit which they had brought against him in the superior court.

W. A. Scott and R. H. Powell, for plaintiffs.

J. D. Rambo, F. B. Dillard and Clarence Wilson, by Harrison & Peeples, for defendants.